IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KIMBERLY ANN MUSOLFF, | ) | Case No. 1:21-CV-1739 |
| | ) | |
| Plaintiff, | ) | JUDGE SARA LIOI |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION**[1] |

Plaintiff, Kimberly Ann Musolff, seeks judicial review of the final decision of the Commissioner of Social Security, denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act.  Musolff challenges the Administrative Law Judge's ("ALJ") negative findings, contending that the ALJ misevaluated the opinion evidence regarding her mental functioning and improperly evaluated whether she met Listing 12.04. Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Musolff's application for DIB be affirmed.

I.     **Procedural History**

On December 18, 2017, Musolff applied for DIB.  (Tr. 384-385).[2]  She alleged that she became disabled on February 27, 2012, due to: (1) a sprained right foot and ankle; (2) a complete

---

[1] This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).
[2] The administrative transcript appears in ECF Doc. 7.

tear of the anterior talofibilar ligament; (3) right ankle fracture of the distal fibula; (4) right ankle instability; (5) depressive psychosis; (6) anxiety disorder; (7) left ankle nondisplaced avulsion fracture lateral malleolus; (8) right hip strain; (9) left ankle impingement; and (10) a herniated disc.  (Tr. 416, 436).  The Social Security Administration denied Musolff's application initially and upon reconsideration.  (Tr. 172-209, 211-244).  Musolff requested an administrative hearing. (Tr. 259-260).

ALJ Keith J. Kearney heard Musolff's case on March 27, 2019.  (Tr. 130-171). Following the hearing, the ALJ submitted an interrogatory to a medical expert and Musolff requested a supplemental hearing, which was held on October 2, 2019.  (Tr. 61-81).  Later, a second supplemental hearing was held based on Dr. Angela Cusimano's responses to an interrogatory regarding Musolff's mental impairments.  (Tr. 39-57, 507).  Following these three hearings, the ALJ denied Musolff's application in a September 28, 2020 decision.  (Tr. 15-27). At Step Three of the sequential evaluation process, the ALJ determined that Musolff did not meet or medically equal Listing 12.04.  (Tr. 19).  Also, at Step Four, the ALJ determined that Musolff had the residual functional capacity ("RFC") to perform sedentary work, except that:

> [Musolff] is limited to standing/walking 4 hours in an 8-hour day.  [Musolff] can occasionally use ramps and stairs but can never use ladders, ropes or scaffolds. [Musolff] can occasionally balance, kneel, stoop, crouch and crawl.  [Musolff] can never operate bilateral foot controls.  [Musolff] is restricted from hazards such as heights or machinery but is able to avoid ordinary hazards in the workplace, such as boxes on the floor, doors ajar, or approaching people or vehicles.  [Musolff] would never be required to operate a motor vehicle during the course of a workday.  [Musolff] is not able to perform at a production rate pace (e.g., assembly line work) but can perform goal-orientated work (e.g., office cleaner).  [Musolff] is limited to occasional interaction with a small group of co-workers, where the contact is casual in nature.  [Musolff] is limited to occasional superficial interaction with the public.  Superficial means that is a member of the public were to approach and inquire as to the nearest restroom, [Musolff] would be able to provide that information.  [Musolff] is limited to a static work environment – tolerating few changes in a routine work setting and when said

2

changes do occur, they would need to take place gradually and would occur infrequently.

(Tr. 20).

Based on vocational expert testimony that an individual with Musolff's age, experience, and RFC could work in such representative occupations as a touch-up screener, table worker, and patcher, the ALJ determined that Musolff wasn't disabled.  (Tr. 26-27).  On July 2, 2021, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-6).  On September 7, 2021, Musolff filed a complaint to obtain judicial review.  ECF Doc. 1.

## II.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Musolff was born on March 18, 1974 and was 37 years old on her alleged onset date. (Tr. 436).  She graduated from high school and completed specialized training in cosmetology, holding a license in the field.  (Tr. 417).  She had past relevant work as a campus manager at a cosmetology school, a "central manager" at a loan company, a merchandizer, mosaic designer, and a trainer in merchandizing, all of which the ALJ determined she was unable to perform. (Tr. 25, 418).

### B.    Relevant Medical Evidence

Musolff raises a challenge to the ALJ's Step Three analysis of whether she meets Listing 12.04 and the Step Four assessment of the mental health opinion evidence; thus, it is only necessary to summarize the evidence related to her mental health impairments.  *See generally* ECF Doc. 8[3].

---

[3] Musolff's brief stated: "Plaintiff generally does not object to the physical capabilities assessed by the ALJ in the formulated RFC, aside from the effects of pain on her ability to focus and the absenteeism that

3

On October 23, 2013, Musolff underwent a psychological evaluation by Donald Weinstein, PhD, of Weinstein and Associates, Inc.  (Tr. 1040).  Dr. Weinstein noted that Musolff arrived on time, was dressed appropriately, and had been previously diagnosed by her primary care physician with depression and anxiety.  (Tr. 1040-1041).  He observed that she demonstrated pain behaviors as she walked.  *Id.*

Dr. Weinstein observed that Musolff was orientated but demonstrated multiple symptoms of cognitive dysfunction.  (Tr. 1042).  She described her affect as "sad/depressed" and she experienced anxiety.  *Id.*  He observed that she had above average intelligence but presented with vegetative symptoms of depression.  *Id.*  Musolff also described sleeping only one or two hours at a time, lacking energy, and focusing "on the things [she] used to be able to do." (Tr. 1042-1043).  Regarding her mood, she described herself as anxious, irritable, crying a "great deal," and socially withdrawn.  (Tr. 1043).  Dr. Weinstein ultimately diagnosed Musolff with an anxiety disorder and major depressive disorder, single episode, and mild.  *Id.*

On November 11, 2013, Musolff met with psychologist Kent Rozel, PhD, of Weinstein and Associates for an initial psychotherapy session.  (Tr. 948-949).  He found that Musolff had mild limitations in her activities of daily living and moderate limitations of her social functioning; concentration, persistence, and pace; and adaptation.  (Tr. 949).  With regard to her functioning, he noted that she could perform self-care activities if given enough time, was withdrawn and limited in her social involvement, reported problems in her concentration, and expressed a suspicion and distrust of supervisors.  *Id.*  He also noted that she might have problems getting along with coworkers and would not do well in stressful situations.  *Id.* Dr. Rozel gave Musolff a good prognosis.  *Id.*

---

would inevitably be associated with the multiple surgeries and the resulting recovery and rehabilitation." ECF Doc. 8 at 13-14.

On April 10, 2014, Musolff received psychotherapy treatment from Carrie Turbow, LISW-S, at Weinstein and Associates.  (Tr. 2520).  During their session, Turbow observed that Musolff demonstrated anxiety, depression, and somatic symptoms.  *Id.*  Turbow indicated that Musolff had moderate limitations in her activities of daily living and concentration, persistence and pace, but she had marked limitations in her social functioning and adaptation.  (Tr. 2521).  Turbow also found that Musolff could perform her self-care activities if given enough time, had impaired sleep habits, crying spells, was easily fatigued, and had lowered energy and motivation.  *Id.*  Additionally, Turbow reported that Musolff had poor concentration and focus, racing thoughts, was withdrawn and limited in her social involvement, and had feelings of hopelessness and helpless.  *Id.*  Turbow noted that Musolff had poor coping mechanisms for her stress, anxiety, and depression.  *Id.*  Turbow gave her a good prognosis.  (Tr. 2520).

On April 28, 2014, Musolff saw psychologist Thomas Cassady, PhD, who found that she exhibited anxiety and depression during their session.  (Tr. 2524-2525).  He found that she had marked limitations in her activities of daily living and concentration, persistence and pace, and extreme limitations in her social functioning and adaptation.  *Id.*  He explained that her limitations in daily living were based on her difficulty in getting up in the morning, cooking, getting dressed, cleaning, and planning her activity.  (Tr. 2525).  Similarly, he based her concentration limitations on her were "poor concentration, poor memory, slowed mental pace," and her social function on her "few social contacts and outlets."  *Id.*  As to her adaptation, he stated she "cannot work."  *Id.*  He gave her a good prognosis but noted that she had not shown any progress.  (Tr. 2524).

From May 8, 2014 to April 28, 2015, Musolff followed a routine schedule of psychiatric visits, meeting with Turbow about once a month and Dr. Cassady once every three months.

(Tr. 678-679, 751-752, 927-928, 2526-2527, 2530-2565).  Throughout these meetings, Musolff
was generally observed to exhibit symptoms of anxiety and depression; Turbow and Dr. Cassady
found she had marked limitation in her daily activities and concentration, persistence and pace
but extreme limitations in her social functioning and adaptation; and she was generally given a
good prognosis.  *See id.*  The explanation given by Turbow and Dr. Cassady for their assessed
limitations, likewise, did not significantly change over the course of treatment, with Turbow
referencing Musolff's trouble getting up and doing things, worries over the future, fatigue, poor
sleep, social isolation, and poor concentration and memory; while Dr. Cassady rarely altered his
brief statements originally provided.  *See id.*

From May 7, 2015 to July 30, 2015, Musolff began meeting with Turbow about twice a
month.  (Tr. 2566-2577).  Throughout these sessions, Musolff's complaints were generally the
same, but during her second to last appointment she reported that her "ADLs [were] good."  *Id.*
Turbow's assessment of Musolff's limitations also fluctuated during this time, with her initially
assessing Musolff with marked limitations in every category of functionality except for her
concentration, which was moderately limited; and then finding only moderate limitations across
every category.  *Id.*

On August 3, 2015, Musolff met with Dr. Cassady, who identified the same symptoms,
assessed the same limitations, and made the same minimal statements in support.
(Tr. 2578-2579).

On August 13, 2015, Musolff met with Turbow.  (Tr. 1586-1587).  Musolff's complaints
were generally the same as before, but Turbow had increased her limitations, noting she had
moderate/marked limitations in her activities of daily living and social functioning and marked
limitations in her adaptation and concentration, persistence, and pace.  (Tr. 1587).  Turbow noted

6

that Musolff was making progress and benefited from relaxation strategies.  *Id.*  The same day, Turbow reported the same limitations to the BWC.  (Tr. 2581, 2583).

From August 27 to September 22, 2015, Musolff met with Turbow three times and, generally, reported the same complaints.  (Tr. 1574-1575, 2581-2587).  Turbow found that Musolff exhibited anxiety, depression, and somatic symptoms during their sessions.  (Tr. 1574, 2581, 2584, 2586).  Turbow's assessment of Musolff's limitations were reduced, with her finding that Musolff had moderate limitations in her daily activities and social functioning and the same marked limitations.  (Tr. 2582, 2585, 2587).  Turbow's narrative on the sessions largely recited Musolff's thoughts on her conditions.  (Tr. 1575, 2582, 2585, 2587).

On October 6, 2015, Musolff met with psychiatrist, Doug Smith, PhD.  (Tr. 1511).  She reported irritability but was positive about her relationship, reported her energy fluctuated, and stated that her mood was okay.  *Id.*  She did not report any new side effects or stressors.  *Id.* Dr. Smith observed that she was engaged appropriately in the assessment, was alert and orientated, was able to attend and concentrate on questions, and her recent and remote memory were intact.  *Id.*  He also noted that her judgment and insight were intact, she had a bright affect, and she reported that her mood was "OK."  (Tr. 1511-1512).

On October 8 and 22, 2015, Musolff met again with Turbow, who, generally, noted the same symptoms, limitations, and narrative on Musolff's limitations as her September visits. (Tr. 2588-2591).

On November 9, 2015, Musolff met again with Dr. Cassady.  (Tr. 2592).  Dr. Cassady noted that she showed symptoms of anxiety and depression.  *Id.*  He found that Musolff had only moderate limitations in her daily activities and concentration but had marked limitations in her

social functioning and extreme limitations in her adaptation. (Tr. 2593). Dr. Cassady also submitted a record of this session to the BWC. (Tr. 2480-2481).

On November 19 and December 9, 2015, Musolff returned to sessions with Turbow. (Tr. 2594-2597). Turbow noted that Musolff exhibited symptoms of anxiety and/or depression had the same limitations and general discussion, save for her last visit where Turbow noted she had moderate/marked adaptation limitations. *Id.*

On December 9, 2015, Musolff also met with Dr. Smith. (Tr. 1479). She reported that her irritability had lessened, and she was having stress from the holiday season. *Id*. Her energy was "alright," her mood was not "numbing," and her sleep was "a little better." *Id.* She also did not report any new medication side-effects or stressors. *Id.* Dr. Smith observed that she was engaged appropriately in the assessment, alert and orientated, able to attend and concentrate on questions, and her recent and remote memory were intact. *Id.* He also noted she had a bright affect and that her medication had removed any suicidal thoughts. (Tr. 1480).

On January 14 and 28, 2015, Musolff again met with Turbow with generally the same symptoms. (Tr. 2598-2601). Turbow assessed her with moderate limitations in her daily activities and social functioning; marked limitations in her concentration, persistence, and pace; and moderate/marked limitations in her adaptation. (Tr. 2599, 2601). Turbow's narrative in support of her limitations largely recited Musolff's own reports. *Id.*

On February 1, 2016, Musolff met with Dr. Cassady, who found that she exhibited symptoms of anxiety and depression. (Tr. 2602). Dr. Cassady escalated her limitations to marked across all functional areas except her ability to adapt, which he found was extremely limited. (Tr. 2603). He justified the limitations on the brief statements referenced previously, except as to her adaptation which he noted "Physical and Psych. TTD benefits." *Id.*

On February 4, 2016, Musolff met with Dr. Smith.  (Tr. 3135).  She reported being irritable and having negative stress from the holidays.  *Id*.  She also reported that her energy was "alright," her pain was "a little better," and she did not have any new side effects of stressors.  *Id*. Dr. Smith's observations were the same as his prior examinations.  (Tr. 3135-3136).  Overall, he found that her condition was improving.  (Tr. 3136).

On February 11 and 25, 2016, Musolff met with Turbow.  (Tr. 1454, 2606).  Turbow assessed that Musolff was moderately limited in her activities of daily living and social functioning and marked limitations in her concentration, persistence and pace and adaptation. (Tr. 1455, 2607).  Turbow's narrative on her limitations generally reiterated Musolff's reported difficulties, which were the same as those previously raised.  *Id*.

From March 17 to September 22, 2016, Musolff continued her rotation of appointments with Turbow, Dr. Smith, and Dr. Cassady.  (Tr. 1416-1417, 2608-2631, 3137).  She saw Turbow about twice a month, Dr. Smith about once a month, and Dr. Cassady once during this time.  *Id*. During this period, Turbow generally found the same symptoms and that Musolff had moderate limitations across every category except for her adaptation which was moderate/marked. (Tr. 1417, 2608-2625, 2628-2631).  Similarly, although Musolff's complaints had minor fluctuations, her encounters with Dr. Smith were generally the same.  (Tr. 3141-3147). Dr. Cassady's findings remained unchanged.  (Tr. 2626-2627).

On September 22, 2016, Musolff met with Alison Potash, LSW.  (Tr. 2632).  Potash noted that Musolff exhibited anxiety, depression, and somatic symptoms during their session.  *Id*. Musolff reported, among other things, having difficulty self-grooming, a low interest in self-care, trouble communicating with others, few recreational activities due to pain, trouble sleeping, being unengaged in her communication, panic attacks, and trouble leaving home.  (Tr. 2633).

She also reported that her boyfriend was moving in with her, she had good concentration, and was able to sustain conversation.  *Id.*  Potash assessed that Musolff had moderate limitations in her daily living activities and social functioning and marked limitation in her adaptation and concentration, persistence, and pace.  *Id.*  Potash gave her a fair prognosis.  (Tr. 2632).

On October 3, 2016, Musolff met with Dr. Smith.  (Tr. 1411).  Musolff's complaints were generally the same as before, only she did complain about her concentration.  *Id.*  Dr. Smith's observations of her psychiatric state were the same.  (Tr. 1411-1412).

On October 6, October 20, and December 1, 2016, Musolff met with Potash and, generally, reported the same struggles with her conditions.  (Tr. 2634-2637, 2640-2641).  Potash's assessment of her symptoms and limitations largely remained unchanged.  *Id.*  But Potash noted that Musolff was demonstrating "sleep" as a symptom.  (Tr. 2634, 2636, 2640).

On December 1, 2016, Musolff met with Dr. Smith.  (Tr. 1380-1381).  Musolff's complaints and Dr. Smith's observations on her psychiatric state were generally the same as from their prior appointments.  *Id.*

From December 15, 2016 to January 12, 2017, Musolff met with Potash four times, generally raising the same complaints about her mental health.  (Tr. 2642-2647).  Potash's assessment of her symptoms and limitations did not change.  *Id.*

On January 19, 2017, Musolff met with psychologist Patrick Yingling, PsyD, who noted that Musolff demonstrated symptoms of anxiety and depression during their session.  (Tr. 2648).  Dr. Yingling recounted Musolff's complaints that, among other things, her sleep was non-restorative, her anxiety limited her social interactions, she has persistent negative thoughts, she did not often leave her house, she had difficulty focusing and paying attention while watching television, and she had intrusive thoughts about her anxiety triggers.  (Tr. 2649).

Dr. Yingling assessed that she had marked limitations in her daily living activities and social functioning and moderate limitations in her adaptation and concentration, persistence, and pace. *Id.*

From January 26 to August 10, 2017, Musolff rotated between Potash, Dr. Smith, and Dr. Yingling, seeing Potash about twice a month, Dr. Smith about once a month, and Dr. Yingling about every three months.  Musolff's sessions with Potash were consistent in her reports, Potash's assessment of her symptoms and limitations, and, when noted, Potash's progress notes generally remarked that Musolff continued to struggle with her depression and was benefiting from their sessions.  (Tr. 1268-1269, 1315-1316, 2650-2659, 2662-2669, 2674-2675).  Her reports to Dr. Smith were likewise consistent with her prior sessions and his observations of her behavior during their appointments were unchanged.  (Tr. 1247-1248, 1284-1285, 1297-1298, 1320-1321, 1339-1340, 3159-3160).  Musolff's reports to Dr. Yingling were generally the same, although he indicated she was improving in her personal hygiene and would occasionally do recreational activities.  (Tr. 2660-2661, 2670-2671).  Additionally, his later assessment of her limitations indicated that she had marked limitations in her daily activities, moderate/marked limitations in her social functioning and concentration, and only moderate limitations in her adaptation.  (Tr. 2671).

From August 24 to December 7, 2017, Musolff continued in her routine appointments with Potash, Dr. Smith, and Dr. Yingling.  Her appointments with Potash were generally the same as her prior visits.  (Tr. 2676-2679, 2682-2689).  Dr. Smith's report of her behavior and his assessment of her mental health were also unchanged from their prior visits.  (Tr. 1218-1219, 1223-1224, 1228-1229, 1236-1238, 1247-1248).  Dr. Yingling's assessment of her limitations was unchanged, though he noted that she had social support from her boyfriend and family, but

she continued to be socially withdrawn when her depression increased and her ability to focus was compromised.  (Tr. 2680-2681).

### C.  Relevant Opinion Evidence

### 1.  Kimberly Musolff – Function Report

On March 18, 2018, Musolff prepared a function report assessing the limitations caused by her conditions.  (Tr. 440, 448).  She reported that she could not concentrate, would lose track of what she was doing, would often feel foggy, had chronic pain when standing, sitting, walking, and driving that often radiated down her legs, and her medication made her lethargic.  (Tr. 440). She reported that it was hard for her to get up and moving in the mornings and, if she had appointments, she would wake up early to get ready, but normally she would sit on the couch with her legs elevated and the tv on in the background.  (Tr. 441).  She would take care of her pets by letting them out in the fenced backyard and her parents and boyfriend also helped.  *Id.* Before her conditions, she could clean the house in one day, garden, mow the grass, walk long distances, go out with friends, travel, exercise, read, and concentrate.  *Id.*  Her conditions also caused her to not be able to stay asleep because of her physical pain.  *Id.*  As to her personal care, it would normally take her until the afternoon to get dressed, but otherwise she could take care of her personal hygiene; it was just hard for her to be motivated to do it.  *Id.*  She did not need reminders to take care of her personal needs or medicine.  (Tr. 442).  She would prepare her own meals, if it was leftovers, cereals, or cheese and crackers, but she used to cook.  *Id.*

Musolff reported that she could do laundry and light cleaning, with breaks, and her boyfriend would help.  *Id.*  She did not do yardwork because of physical restrictions.  (Tr. 443). She would go outside for doctor's appointments and shopping but otherwise did not because of her anxiety and panic attacks.  *Id.*  She could drive, ride in a car, and go out alone but usually

12

went with someone. *Id.* She would go shopping in stores or online; if she was shopping in a store it was about once or twice a month for about an hour. *Id.* She could handle her own finances. *Id.*

Prior to her injury, Musolff reported that her hobbies included exercising at the gym, walking long distances, gardening, dancing, social activities, reading, and outside yard work. (Tr. 444). Since her injury, she stated she could not do any of those hobbies or interests. *Id.* She reported, however, that she spent time with others, lived with her boyfriend, and would speak to her parents and a few friends on the phone. *Id.* She also reported that she had problems getting along with others because she would stay to herself and be very irritable and moody. (Tr. 445). She would no longer have weekly lunches with her friends, travel, or take walks. *Id.*

Musolff also described how she could only pay attention for minutes, and she could not finish what she started. *Id.* She would need to reread written instructions and could follow spoken instructions "ok," if not too detailed. *Id.* She got along fine with authority figures but could not handle stress because her anxiety made her sick. (Tr. 446). She had not experienced any recent changes in her routine but had previously reacted to them fine. *Id.* She had increased fears of planes landing on her house or being shot in a public place or by a drive-by-shooter. *Id.*

### 2. Consultive Examiner – Donald Scott, Ph.D.

On August 18, 2017, psychologist Donald Scott, PhD, reviewed Musolff's mental health records to determine whether additional psychotherapy was needed. (Tr. 1242-1243, 1245). He found that the records did not support the treatment request, as she has been in therapy since 2014 and has shown little to no progress. (Tr. 1242-1244). He found that Musolff had reached a treatment plateau and recommended denying her requested additional psychotherapy sessions. (Tr. 1244-1245).

3. **Medical Sources - Weinstein and Associates, Inc. Evaluations for the Ohio Bureau of Workers Compensation**

a. **Kent Rozel, Ph.D.**

From November 11, 2013 to March 24, 2014, Dr. Rozel completed a "Physician's Report of Work Ability" for the Ohio Bureau of Workers' Compensation ("BWC") regarding Musolff mental functioning.  (Tr. 2452-2467).  He consistently found that she had mild limitations in performing her activities of daily living and moderate limitations in her social functioning; concentration, persistence and pace; and adaptation.  (Tr. 2452, 2454, 2456, 2458, 2460, 2462, 2464, 2466).  Specifically, he asserted that her "depress psychosis" caused her temporary total disability to the point where she was too "depressed to work or to receive training."  (Tr. 2453, 2455, 2457, 2459, 2461, 2463, 2465, 2467).

b. **Thomas M. Cassady, Ph.D.**

From April 28, 2014 to October 28, 2016, Dr. Cassady also completed the "Physician's Report of Work Ability" for the BWC a total of six times, about once every four months. (Tr. 2468-2479).  Prior to November 9, 2015, the form required that he specify the individual's mental functioning.  (*See* Tr. 2468, 2470, 2472, 2474, 2476, 2478).  During this period, he found that Musolff had marked limitations in her activities of daily living and her concentration, persistence and pace, and he also found that she had extreme limitations in her social functioning and adaptation.  *Id*.  Further, her "depress psychosis" and anxiety he thought were both causing temporary total disability.  (Tr. 2469, 2471, 2473, 2475, 2477, 2479).  Following that time period, the form changed and simply asked whether the condition prevented the individual from returning to work and what clinical findings supported that finding.  (*See* Tr. 2480-2491).  Dr. Cassady consistently found that Musolff's "depress psychosis" and anxiety disorder prevented her from returning to work and he referenced clinical findings of, among other things,

14

moodiness, memory issues, concentration issues, social withdrawal, sleep issues, and poor energy. *Id.*

### c.  William Miller, Ph.D.

On October 28, 2016, psychologist William Miller, PhD, completed a "Physician's Report of Work Ability" for the BWC.  (Tr. 2489).  He found that Musolff was temporarily disabled based on her pain, depression, inability to leave home, anxiety, panic attacks, and isolation from friends.  *Id*.

### d.  Patrick Yingling, Psy.D.

On January 19, 2017, Dr. Yingling completed the "Physician's Report of Work Ability" for the BWC and found that the symptoms of her mental health, including depressed mood, anxiety, panic attacks, negatively impacted her ability to focus, which prevented her from returning to the workplace.  (Tr. 2490-2491).  On April 13, 2017, July 6, 2017, and September 28, 2017, Dr. Yingling reevaluated Musolff and reached the same conclusions.  (Tr. 2492-2498).

### 4.  Medical Source – Patrick Yingling, Psy.D.

On June 27, 2018[4], Dr. Yingling completed a mental impairment questionnaire regarding Musolff's condition.  (Tr. 2892).  He explained that he had treated Musolff once a month since January 2017 and his clinical findings showed daily episodes of tearfulness, panic attacks more than four times a month, daily anxiety, and insomnia with less than five hours of sleep a night. *Id.*  He identified that Musolff exhibited the following signs and symptoms: anhedonia, appetite disturbance, decreased energy, feelings of worthlessness or guilt, generalized persistent anxiety, mood disturbance, difficulty thinking or concentrating, paranoid thinking or inappropriate

---

[4] This evaluation was made after Musolff's December 31, 2017 date last insured but included information regarding Musolff's condition before and after that date.

suspiciousness, emotional lability, easy distractibility, sleep disturbance, and recurrent severe

panic attacks.  (Tr. 2893).

Based on these symptoms, Dr. Yingling found that Musolff had the following mental

abilities as to unskilled work:

1)  She had a limited but satisfactory ability to ask simple questions or request assistance
    and be aware of normal hazards and take precautions;

2)  She had a seriously limited but not precluded ability to (i) remember work-like
    procedures; (ii) understand and remember very short and simple instruction, (iii) carry
    out very short and simple instructions, (iv) maintain regular attendance and be
    punctual within customary, usually strict tolerances, (v) sustain an ordinary routine
    without special supervision, (vi) accept instructions and respond appropriately to
    criticism from supervisors, (vii) get along with co-workers or peers without unduly
    distracting them or exhibiting behavior extremes, and (viii) respond appropriately to
    changes in a routine work setting;

3)  She was unable to meet competitive standards in working in coordination with or
    proximity to others without being unduly distracted or make simple work-related
    decisions; and

4)  She had no useful ability to function in maintaining attention for two-hour segments,
    complete a normal workday or week without interruption from her symptoms, and
    perform at a consistence pace without an unreasonable number and length of rest
    periods."

(Tr. 2894).  He found similar limitations as to the abilities required for semiskilled and skilled

work and particular types of jobs.  (Tr. 2895).

Overall, Dr. Yingling found that Musolff had marked limitations on her daily living

activities and in maintaining concentration, persistence, or pace.  (Tr. 2896).  He found only

moderate limitations as to her maintaining social functioning.  *Id.*  He also indicated that she had

had a medically documented mental health conditions for at least two years, that Musolff would

be likely to decompensate with even minimal increased in mental demands or change in

environment, and she had a current history of one or more years inability to function outside a

highly supportive living arrangement.  *Id.*  He anticipated that her conditions would make her absent from work for more than four days a month.  (Tr. 2897).

### 5.    Interrogatory Respondent – Angela Cusimano, Ph.D.

On December 9, 2019, in response to an interrogatory issued by the ALJ, psychologist Angela Cusimano, PhD, completed an evaluation of Musolff's ability to do work-related activities.  (Tr. 3591-3593).  She found that Musolff was not limited in her ability to: (i) understand and remember simple instructions, (ii) carry out simple instructions, and (iii) make judgments on simple work-related decisions.  (Tr. 3591).  She found that Musolff was moderately limited, however, in her ability to: (i) understand and remember complex instructions, (ii) carry out complex instructions, and (iii) make judgments on complex work-related decisions.  *Id.*  She based this on the clinical findings regarding Musolff's attention, concentration, memory, and intact insight and judgment, as well as the notation she had marked impairments in concentration and adaptation.  *Id.*

As to interaction with others, Dr. Cusimano found that Musolff had only moderate limitations in her ability to respond appropriately to usual work situations and to changes in routine work settings.  (Tr. 3592).  She based this on Musolff's appropriate behavior during assessments, her positive relationship with her boyfriend, and her marked impairment in adaptation.  *Id.*

### 6.    State Agency Psychological Consultants

On April 11, 2018, Audrey Todd, PhD, evaluated Musolff's mental health limitations based on the medical evidence.  (Tr. 199-201).  She found that Musolff did not show any significant limitations in her understanding and memory.  (Tr. 200).  But, as to her ability to sustain concentration and persistence, Dr. Todd found that she was moderately limited in her

ability to maintain attention and concentration for extended periods and her ability to complete a normal workday and week without interruption from her symptoms and to perform at a consistent pace without an unreasonable number and length of rests periods.  *Id.*  Otherwise, Dr. Todd found that Musolff was not significantly limited in her concentration and persistence. *Id.*  Although Dr. Todd found that Musolff did not face any significant limitation in her social interactions, she noted that Musolff was capable of occasional, superficial interactions with the general public and had no significant limitations in interacting with coworkers and supervisors. (Tr. 200-201).  As to Musolff's ability to adapt, Dr. Todd found that she was moderately limited in her ability to respond appropriately to changes in the work setting but otherwise was not significantly limited.  (Tr. 201).

On May 30, 2018, Leslie Rudy, PhD, reconsidered Musolff's mental health limitations. (Tr. 234-236).  Dr. Rudy agreed with Dr. Todd's findings on Musolff's ability to understand and remember, sustain concentration and persistence, and adaptation.  *Id*.  Dr. Rudy, however, found that Musolff was limited in her ability to socially interact, being moderately limited in her ability to interact appropriately with the general public.  (Tr. 235).

### D.    Relevant Testimonial Evidence

#### 1.    March 27, 2019 Hearing

Musolff testified at the hearing.  (Tr. 138-162).  She lived with her boyfriend and, as to her mental conditions, Musolff explained that her depression caused her to lack interest in things, to desire to be alone, and increased with her pain.  (Tr. 138-139, 148).  She also experienced anxiety in that she felt more "panicky" and worried about things she did not before.  *Id.*  She would have "almost debilitating" panic attacks about once or twice a month.  (Tr. 149).  She would leave the house about twice a week or more for appointments but otherwise did not go

18

out.  (Tr. 149-150).  She would also go grocery shopping twice a month with her boyfriend or father.  (Tr. 150).

Musolff stated that, if she had an appointment, she would typically get up, take care of her personal needs and, after her appointment, she might try to read a book.  *Id.*  But she struggled to concentrate.  (Tr. 150-151).  She would try to help with dinner, usually doing things that she could do sitting down, such as cutting vegetables.  (Tr. 151).  She would also let her animals out into the fenced yard.  *Id.*  She testified that she had good days and bad days and, on a good day, if she tried to sweep or clean, she would be "down" for the next two or three days.  (Tr. 151-152).  She explained that some of her medications made her "loopy" or "foggy" and sleepy.  (Tr. 161-162).

### 2. October 2, 2019 Hearing

Musolff testified at the hearing about her prior work experience.  (Tr. 71-72).

### 3. September 1, 2020 Hearing

Musolff testified at the hearing.  (Tr. 48-57).  As to her mental health, from 2013 onward, Musolff had struggled with depression, being diagnosed in 2012 by her family physician and receiving counseling throughout the entire SSA process.  (Tr. 51).  Her therapist had her on medication and attending therapy sessions, with the goal of helping her to leave her house.  (Tr. 52).  Since her injury, she had consistently struggled with going out with friends or going to the store.  *Id.*

## III. Law & Analysis

### A. Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C.

§ 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  "Substantial

evidence" is not a high threshold for sufficiency.  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154

(2019).  "It means – and means only – such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion."  *Id.* (quotation marks omitted).  Even if a preponderance of

the evidence supports the claimant's position, the Commissioner's decision still cannot be

overturned "so long as substantial evidence also supports the conclusion reached by the ALJ."

*O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quotation marks

omitted).  Under this standard, the court cannot decide the facts anew, evaluate credibility, or

re-weigh the evidence.  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).  And "it

is not necessary that this court agree with the Commissioner's findings," so long as it meets this

low standard for evidentiary support.  *Rogers*, 486 F.3d at 241.  This is so because the

Commissioner enjoys a "zone of choice" within which to decide cases without being second-

guessed by a court.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that

decision when the Commissioner failed to apply proper legal standards, unless the legal error

was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision .

. . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error

prejudices a claimant on the merits or deprives the claimant of a substantial right.").  And the

court will not uphold a decision when the Commissioner's reasoning does "not build an accurate

and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d

875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996));

*accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1,

2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked.").

### B.    Step Three: Medical Listing 12.04

Musolff contends that the ALJ erred in evaluating her conditions under Listing 12.04 for depressive, bipolar, and related disorders.  ECF Doc. 8 at 17.  She contends that the records evidence demonstrated that she had marked limitations in her ability to interact with others; concentrate, persist, or maintain pace; adapt or manage herself, as well as meeting both requirements of the Paragraph C criteria.  ECF Doc. 8 at 17-18.  The Commissioner disagrees. ECF Doc. 9 at 14.

At Step Three, a claimant has the burden to show that she has an impairment or combination of impairments that meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1.  *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001); 20 C.F.R. § 404.1520(a)(4)(iii).  If the claimant meets all of the criteria of a listed impairment, she is disabled; otherwise, the evaluation proceeds to Step Four.  20 C.F.R. § 404.1520(d)-(e); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *see also Rabbers v. Comm'r of SSA*, 582 F.3d 647, 653 (6th Cir. 2009) ("A claimant must satisfy all of the criteria to meet the listing.").

In evaluating whether a claimant meets or equals a listed impairment, an ALJ must "actually evaluate the evidence, compare it to [the relevant listed impairment], and give an explained conclusion, in order to facilitate meaningful judicial review."  *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011) (noting that, without such analysis, it is impossible for a reviewing court to determine whether substantial evidence supported the decision).  The ALJ "need not discuss listings that the [claimant] clearly does not meet, especially when the claimant does not raise the listing before the ALJ."  *See Sheeks v. Comm'r of*

*SSA*, 544 F. App'x 639, 641 (6th Cir. 2013).  "If, however, the record raises a substantial question as to whether the claimant could qualify as disabled under a listing, the ALJ should discuss that listing."  *Id.* at 641; *see also Reynolds*, 424 F. App'x at 415-16 (holding that the ALJ erred by not conducting any Step Three evaluation of the claimant's physical impairments, when the ALJ found that the claimant had the severe impairment of back pain).

"A claimant must do more than point to evidence on which the ALJ could have based his finding to raise a 'substantial question' as to whether he satisfied a listing."  *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432 (6th Cir. 2014) (quoting *Sheeks*, 544 F. App'x at 641-42).  "Rather, the claimant must point to specific evidence that demonstrates [she] reasonably could meet or equal every requirement of the listing."  *Id.* (citing *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)).  "Absent such evidence, the ALJ does not commit reversible error by failing to evaluate a listing at Step Three."  *Id.* at 433; *see also Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014) (finding harmless error when a claimant could not show that he could reasonably meet or equal a listing's criteria).

Listing 12.04 establishes the criteria for affective disorders.  20 C.F.R. pt. 404, Subpt. P, App. 1 § 12.04.  To meet the Listings' severity level for an affective disorder, the claimant must show that she meets: (1) the impairment-specific medical criteria in Paragraph A; (2) the functional limitations criteria in Paragraphs B or C.  20 C.F.R. pt. 404, Subpt. P, App. 1 §§ 12.00(A), 12.04.  To meet Paragraph A for affective disorders, the claimant must show medical documentation of:

> (1) Depressive disorder, characterized by five or more of the following: (a) depressed mood; (b) diminished interest in almost all activities; (c) appetite disturbance with change in weight; (d) sleep disturbance; (e) observable psychomotor agitation or retardation; (f) decreased energy; (g) feelings of guilt or worthlessness; difficulty concentrating or thinking; or (i) thoughts of death or suicide[; or]

22

(2) Bipolar disorder, characterized by three or more of the following:
(a) pressured speech; (b) flight of ideas; (c) inflated self-esteem; (d) decreased
need for sleep; (e) distractibility; (f) involvement in activities that have a high
probability of painful consequences that are not recognized; or increase in
goal-directed activity or psychomotor agitation.

20 C.F.R. pt. 404, Subpt. P, App. 1 § 12.04(A).  To meet Paragraph B, the claimant must show

that her affective disorder resulted in an "extreme limitation of one or marked limitation of two,

of the following areas of mental functioning: (1) understand, remember or apply information;

(2) interact with others; (3) concentrate, persist or maintain pace; (4) adapt or manage oneself."

20 C.F.R. pt. 404, Subpt. P, App. 1 § 12.04(B).  To meet the criteria for Paragraph C, a claimant

must show that she had a:

Medically documented history of the existence of the disorder over a period of at
least 2 years, and there is evidence of both: (1) medical treatment, mental health
therapy, psychosocial support's, or a highly structured setting(s) that is ongoing
and that diminishes the symptoms and signs of [the] mental disorder; and
(2) marginal adjustment, that is, [the claimant has] minimal capacity to adapt to
changes in [her] environment or to demands that are not already part of [her] daily
life.

20 C.F.R. pt. 404, Subpt. P, App. 1 § 12.04(C).

Although a close question, I find that the ALJ applied the proper legal standards and

reached a determination supported by substantial evidence in determining that Musolff did not

meet or medically equal Listing 12.04.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  When

reviewing an ALJ's decision, we apply the "substantial evidence" standard.  Unfortunately, in

some instances, an analysis is concerningly minimal but still survives this low bar.  This is such a

case.  Here, the ALJ rejected those records supporting marked limitations in Musolff's mental

health functioning, namely the BWC forms and Dr. Yingling's assessment.  (*See* Tr. 19).  Rather

than showing why the limitations were substantively wrong when looking at other medical

records, the ALJ simply stated that the BWC records were unpersuasive because they were check

23

mark forms and Dr. Yingling's assessment was unpersuasive because "[t]hese limits are based largely on self-report[s] of the claimant." *Id.*  This level of analysis provides little, if any, means for the reader to understand why the marked limitations were rejected.

The ALJ continues on, however, identifying and explaining why he found that Musolff had only moderate limitations across the areas of functioning. *Id.*  Here, the ALJ provided some explanation, referencing Musolff's testimony, treatment notes indicating she was comfortable during medical appointments, and records indicating she had appropriate grooming and hygiene. *Id.*  Although the ALJ did not include any specific citations to the record, he did provide justification for his findings; thus, allowing for meaningful review. *Reynolds*, 424 F. App'x at 416.

Moreover, substantial evidence supports the ALJ's finding that Musolff did not meet the Paragraph B or C criteria for Listing 12.04. 42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241. Reading the decision with common sense, such evidence includes: (1) Musolff's testimony that she only went out for appointments and she lived with others, (Tr. 138-139, 149-150); (2) the state agency consultants' opinions, who found moderate to minimal limitations (Tr. 200-201, 234-236); and (3) Dr. Cusimano's opinion, who also found that Musolff had only moderate to mild limitations in her functioning (Tr. 3591-3592).  Although Musolff had two years of mental health treatment records, these same sources indicate that she did not meet the marginal adjustment requirement for Paragraph C. 20 C.F.R. pt. 404, Subpt. P, App. 1 § 12.04(C).  And "when a record presents substantial evidence supporting two contrary conclusions, a reviewing court must affirm the findings of the Commissioner." *Wines v. Comm'r of Soc. Sec.*, 268 F. Supp. 2d 954, 960 (N.D. Ohio Jun. 24, 2003) (citing *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)).  Accordingly, despite the ALJ's simplistic and conclusory rejection of the BWC

forms and Dr. Yingling's assessment, when reading the decision as a whole, substantial evidence supported the ALJ's finding.  The ALJ's decision in this regard should be affirmed.

### C.     Step Four: Medical Opinions

Musolff contends that the ALJ failed to properly evaluate the opinions from Weinstein and Associates.  ECF Doc. 8 at 13-14.  As to her physical RFC, Musolff asserts that she does not generally challenge her physical capacities but challenges the effects of her pain on her ability to focus and the absenteeism that would result from additional surgeries she may have.  ECF Doc. 8 at 13-14.[5]  She argues that the ALJ erred in assessing the Weinstein and Associates' opinions her mental functional limitations, cumulatively dismissing the opinions based on the sources' lack of program knowledge of the SSA and that their opinions were on "check the box" forms.  ECF Doc. 8 at 14.  In contrast, she argues, the ALJ relied on Dr. Cusimano's response to the interrogatory, which was also a check-box opinion, rather than the numerous opinions by Weinstein and Associates, and failed to provide an explanation for doing so.  ECF Doc. 8 at 14-15.  She asserts that her treatment records rejected by the ALJ show her increasing limitations and, generally, were consistent in reporting, including Dr. Yingling's assessment, that she had two marked limitations.  ECF Doc. 8 at 15-17.  The Commissioner disagrees.  ECF Doc. 9 at 6-14.

At Step Four of the sequential evaluation, the ALJ must determine a claimant's RFC after considering all the medical and other evidence in the record.  20 C.F.R. § 404.1520(e).  In doing so, the ALJ is required to "articulate how [he] considered the medical opinions and prior

---

[5] To the extent Musolff intends to raise a challenge to the ALJ's RFC determination as to the specific limitations, she has waived any argument on that ground by failing to substantively address it.  *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developing argumentation are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones.").

administrative medical findings." 20 C.F.R. § 404.1520c(a).  At a minimum, the ALJ must explain how he considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors.  20 C.F.R. § 404.1520c(b)(2).[6]  According to the regulation, the more consistent a medical opinion is with the evidence from other medical and nonmedical sources, the more persuasive the medical opinion will be.  This is the consistency standard.  And the regulation specifies that the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion, the more persuasive the medical opinion will be.  This is the supportability standard.  *See* 20 C.F.R. § 404.1520c(c)(1)-(2).

The Sixth Circuit has yet to articulate a harmless error test under the revised § 404.1520c. However, other district courts have applied the analysis previously used when evaluating an ALJ's treatment of a treating physician's opinion for applications filed before March 27, 2017. *See Moulden v. Kijakazi*, No. 1:20-CV00152, 2022 U.S. Dist. LEXIS 9342, *18-19 (W.D. Ky. Jan. 18, 2022) (applying the good reasons rule to an application for SSI filed after March 27, 2017); *Hardy v. Comm'r of Soc. Sec.*, No. 20-10918, 2021 U.S. Dist. LEXIS 158950, at *20-21 (E.D. Mich. Aug 13, 2021) (same); *Vaughn v. Comm'r of Soc. Sec.*, No. 20-CV-1119-TMP, 2021 U.S. Dist. LEXIS 134907, at *32-34 (W.D. Tenn. July 20, 2021) (same).

Under that analysis, the failure to strictly comply with these legal procedures may be harmless when: (1) the opinion is so patently deficient that it could not be credited; (2) the opinion was actually adopted; or (3) the ALJ met the goal of these procedural safeguards, despite failing to strictly comply with the regulations.  *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543,

---

[6] Other factors include: (1) the length, frequency, purpose, extent, and nature of the source's relationship to the client; (2) the source's specialization; and (3) "other factors," such as familiarity with the disability program and other evidence in the record.  20 C.F.R. § 404.1520c(c)(3)-(5).

551 (6th Cir. 2010) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004)). This last circumstance may take the form of an "indirect attack," when the ALJ's analysis of other opinions in the record or of the claimant's ailments calls to question the supportability of the opinion or its consistency with other evidence. *Id.* (citing *Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 470 (6th Cir. 2006); *Hall v. Comm'r of Soc. Sec.*, 148 F. App'x 456, 464 (6th Cir. 2006)). The key question in determining whether an "indirect attack" satisfies the spirit of the regulatory framework is whether the analysis as a whole permits the claimant and reviewing court to glean a "clear understanding" of the reasons for the reasons the limitations in an opinion were not adopted. *Id.*

The ALJ applied the proper legal standards or harmlessly erred in finding that the opinions submitted by Weinstein and Associates were unpersuasive. 42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241. It is important to first note that the ALJ's summary treatment of Weinstein and Associates' records glosses over the distinct types of records involved. The submitted evidence consists of three different types of records that are each subject to different standards. The first constitutes the "Mental Health Notes Summary" written by Weinstein and Associates and submitted to the BWC on Musolff's behalf and are contained in Exhibit 12F. (*See* Tr. 2450-2695). These summaries allowed the mental health care provider to check boxes indicating the symptoms Musolff exhibited, information about the sessions and her treatment, and her functional status. (*See e.g.*, Tr. 2630-2631). Although the forms also provided space for the health care provider to give additional information about Musolff's functional status, this space in the notes was generally a recitation of Musolff's own reports or too brief of a statement to provide any real understanding as to why the provider found the functional status he did. (*Compare* Tr. 2630-2631 *and* Tr. 2632-2633 *with* Tr. 2626-2627). The second category of

treatment notes submitted were Weinstein and Associates' own treatment summaries contained in Exhibit 2F.  (*See* Tr. 678-679, 751-752, 927-928, 948-949, 1284-1285, 1268-1269, 1315-1316, 1416-1417, 1454-1455, 1574-1575, 1586-1587).  These notes are largely identical to the summaries submitted to the BWC but do provide additional notations regarding Musolff's progression.  Additionally, Exhibit 2F contains Dr. Smith's treatment notes, which provide a psychiatric symptom review for each visit and the remaining records.  (Tr. 1218-1219, 1223-1224, 1228-1229, 1236-1238, 1247-1248, 1284-1285, 1297-1298, 1320-1321, 1339-1340, 1380-1381, 1411-1412, 1479-1480, 1511-1512).  Because of each category of record implicates the regulations in different ways, I will discuss each individually.

### 1. BWC Summaries

As to the treatment notes submitted to the BWC, the ALJ applied the proper legal standards and reached a determination supported by substantial evidence in finding them unpersuasive.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  Although the ALJ did not use the term "supportability," the ALJ unambiguously discussed the concept in addition to noting his obligations under the regulations.  The ALJ noted his obligations under § 404.1520c and discussed how that the treatment notes were "check mark forms," had little explanation of the precise limitations, and lacked detailed explanation justifying the limitation.  *See* 20 C.F.R. § 404.1520c(c)(1)-(2); (Tr. 20, 23).  When such forms are used and unaccompanied by any explanation, the Sixth Circuit has held that the notes are "'weak evidence at best' and meets our patently deficient standard."  *Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 475 (6th Cir. 2016) (citing *Friend*, 375 F. App'x at 551).  In other words, in order for an opinion to meet the supportability criterion, the opinion must have support in the findings documented by the medical provider in her/his own clinical records.  The BWC forms did not contain clinical

findings that were otherwise documented in treatment or visit-specific records.  Thus, the ALJ's decision to find the BWC records unpersuasive because they were check box forms was a way to indicate that there was inadequate demonstration that the opinions were supportable.

Although the ALJ did not directly address the consistency of these opinions with the other record evidence, the lack of supportability alone is a basis for finding a source opinion to be unpersuasive.  *See Okonski v. Comm'r*, No. 3:20-cv-1614, 2021 U.S. Dist. LEXIS 204564, *30 (N.D. Ohio October 25, 2021); *Kearns v. Comm'r*, No. 3:19-1243, 2020 U.S. Dist. LEXIS 95697 (N.D. Ohio Feb. 3, 2020)(Mag. Judge Greenberg)(adopted by *Kearns v. Comm'r of Soc. Sec.,* 2020 U.S. Dist. LEXIS 95067 (N.D. Ohio, June 1, 2020)); *Baca v. Saul*, No. 20-225, 2021 U.S. Dist. LEXIS 70814, at *17-18 (D. N.M. Apr. 13, 2021) (stating that an ALJ's supportability finding would have been a sufficient basis upon which to reject a source's opinion even if the consistencies the ALJ discussed were not).  Though imperfectly expressed, this was sufficient to satisfy the requirement of the regulation. 20 C.F.R. § 404.1520c(b)(2).

Further, substantial evidence supported the ALJ's finding that the BWC forms were unpersuasive because none of the records cited to actual treatment notes supporting the opinion or provided the treating provider's thought-process or reasoning for the limitations.  (*See* Tr. 2450-2695).  As a result, substantial evidence exists in the form of what the records themselves lacked.  *Biestek*, 139 S. Ct. at 1154.  And a reasonable mind would not find support for a position contrary to the ALJ's interpretation of the records from the records themselves.  *Id.*

### 2.    Weinstein and Associates' Internal Treatment Notes

Although a much closer question, I find that the ALJ harmlessly erred in his evaluation of Weinstein and Associates' own treatment summaries and substantial evidence supports his finding that the summaries were unpersuasive.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.

Here, the ALJ's summary discussion of the Weinstein evidence complicates our review. Although the ALJ cited the records contained in Exhibits 2F and 12F, he did so only for his most general statements on their persuasiveness and only cited Exhibits 12F (the BWC notes) in his more specific and substantive explanation of why the records were unpersuasive.  (*See* Tr. 23). As a result, it is difficult to determine how the ALJ interpreted the notes.  On the one hand, the ALJ's own citations counsel the reader to restrict the ALJ's statements to only the BWC-related notes.  *See id*.  But on the other hand, given the similarity in the content and format of the notes, the ALJ may very well have believed his discussion sufficient and that it could be construed to apply to both categories of records.

Regardless of the ALJ's citations, I find that because of the similarities between the BWC forms and the Weinstein and Associates internal notes and the ALJ's unambiguous rejection of all of Weinstein and Associates' opinions, any error from the ALJ's summary discussion of the treatment notes is harmless.  The ALJ's use of citations is regrettable.  However, Weinstein and Associates' in-house treatment notes are virtually identical in their content and format to the BWC forms and, thus, the ALJ's analysis reasonably applies to both.  *See Friend*, 375 F. App'x at 551.  The ALJ's generalized statements that "Records from Weinstein and Associates show that treaters consistently state that Claimant is temporarily and totally disabled by allowed depression and anxiety (Exhibits 2F, 12F)," and "Personnel at Weinstein and Associates consistently note marked limitations in social functioning and adaptation prior to December 31, 2017 (Exhibit 2F, 12F)," appear to support this position.  (Tr. 23).  For those notes in Exhibit 2F that essentially mimic the format of the BWC forms, this does appear to create a clear basis for us to find that the ALJ's rejection of the BWC forms applies with equal force to Weinstein notes that mimicked the format and limited discussion of the BWC forms.  (Tr. 678-679, 751-752, 928,

974-949, 1218-1219, 1223-1224, 1228, 1236-1268, 1242-1245, 1247-1248, 1284-1285, 1297-1298, 1320-1321, 1339-1340, 1268-1269, 1315-1316, 1380-1381, 1411-1412, 1416-1417, 1454-1455, 1479-1480, 1511, 1574-1575, 1586-1587).  As a result, rather than being unable to create a logical bridge between the evidence and the ALJ's conclusion, the ALJ's generalized statements about those records, leave the reader with only one conclusion as to how the ALJ evaluated Weinstein records with similar content.  *See Friend*, 375 F. App'x at 551; *Fleischer*, 774 F. Supp. 2d at 877.  Accordingly, the same lack of expression of clinical record support that provided substantial evidence for the ALJ's rejection of the BWC notes also supported the ALJ's rejection of the Weinstein internal treatment notes.

Musolff contends that "the sheer volume" of check box forms should have led to the ALJ's acceptance of the opinions, noting that the ALJ found Dr. Cusimano's interrogatory response persuasive despite it too being essentially a check box form.  ECF Doc. 8 at 14.  In reality, however, this contention merely asks this court to reweigh the opinion evidence based on the quantity of forms compiled by Weinstein and Associates.  We are not permitted to accept Musolff's invitation that we reweigh the evidence.  *See Jones*, 336 F.3d at 476.

### 3.    Dr. Smith's Treatment Notes

As to Dr. Smith's treatment notes, I find the ALJ's lack of explicit articulation as to their supportability or consistency harmless because any opinions that could be derived from his notes are consistent with the ALJ's RFC.[7] 42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  Dr. Smith's notes provided a far more detailed account of Musolff's condition, specifying for each

---

[7] Although it is unclear from the records themselves, whether Dr. Smith was part of Weinstein and Associates' practice, because the ALJ included him in his discussion of Weinstein and Associates' records, I have considered him to be part of the practice.  The ALJ identified Dr. Smith's treatment notes and several of his observations but cited only those of his records contained in a different exhibit (Exhibit 27F).  (*See* Tr. 23).

appointment her orientation, attention span, concentration, recent and remote memory, speech, through process, thought association, judgment and insight, and mood and affect.  (*See e.g.*, Tr. 1380-1381).  Although from the ALJ's citations it is clear that he considered some of Dr. Smith's notes, the notes are too dissimilar from the BWC notes to find any indirect rejection. But I find the ALJ's articulation error ultimately harmless.  The ALJ was not under an obligation identify every piece of evidence he reviewed, *Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004); moreover, because Dr. Smith's findings were generally consistent with the ALJ's RFC, the failure to be more specific with regards to his opinion, if somewhat inconsistent with the regulations, was harmless error.  *Beery v. Comm'r of Soc. Sec.*, 819 F. App'x 405, 408 (6th Cir. 2020) ("We will treat an ALJ's failure to articulate [his] reasons for the weight [he] assigned a medical source opinion as harmless error if the ALJ adopted the opinion or made findings consistent with that opinion.) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004)).

Accordingly, because the ALJ properly evaluated the BWC-submitted treatment notes, and harmlessly erred as to the Weinstein and Associates' internal treatment notes and Dr. Smith's notes, the decision must be affirmed.

## IV.  Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Musolff's application for DIB be affirmed.

Dated: April 27, 2022

Thomas M. Parker
United States Magistrate Judge

-------------------------------------------------

### Objections, Review, and Appeal

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge.  Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C. § 636(b)(1); Local Rule 72.3(b).  Properly asserted objections shall be reviewed de novo by the assigned district judge.

* * *

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation.  *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019).  Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).  Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 U.S. Dist. LEXIS 100383, *6 (W.D. Ky. June 15, 2018) (quoting *Howard*).  The failure to assert specific objections may in rare cases be excused in the interest of justice.  *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).